THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW D. COUCH, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 23 C 14832 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARTIN O'MALLEY, COMMISSIONER OF | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Andrew Couch appeals the decision of Martin O'Malley, Former Commissioner of the Social Security Administration ("Commissioner"),[1] denying his disability insurance benefits under Title XVI of the Social Security Act. Now before the Court is Couch's Motion to Reverse or Remand the Commissioner's Decision, (Dkt. 11), and the Commissioner's Motion for Summary Judgment (Dkt. 14). For the reasons below, the Commissioner's Motion [14] is granted, Couch's Motion [11] is denied.

## BACKGROUND

Andrew Couch suffers from depression, anxiety, schizoaffective disorder, and degenerative disc disease of the lumbar spine. (AR at 25).[2] He applied for disability insurance benefits in June 2019, alleging a disability onset date of June 1, 2018. (AR at 13). His application was denied but, on appeal, the case was remanded for further analysis. (AR at 672). Upon further

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court orders that Leland Dudek, Acting Commissioner of the United States Social Security Administration, is hereby substituted as Defendant in this case. Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").
[2] "AR" refers to the Administrative Record, Dkt. 7.

1

consideration, the administrative law judge ("ALJ") again adjudicated Couch as "not disabled". (AR at 698).

### I. Couch's Treatment History

In August 2018, Andrew Couch sought treatment from Dr. Ira Goodman for pain in his lower back, buttocks, and legs. (AR at 20). Dr. Goodman observed that Couch had a slow gait, slouched posture, tender lower and mid-region facets, and a limited range of motion in his lumbar spine. (*Id.*) As such, Goodman diagnosed Couch with multilevel lumbar disc degeneration with mild to minimal canal stenosis. (*Id.*) At the time, Couch was taking 40mg of Methadone daily, but his pain remained at a six out of ten. (*Id.*) Dr. Goodman discontinued Couch's Methadone prescription, and instead prescribed him Percocet up to four times a day. (*Id.*) Two months later, on October 18, 2018, Couch attended a follow-up visit with Dr. Goodman, during which he reported that his pain had not changed with the new medication. (*Id.*) Dr. Goodman then prescribed Couch 20mg of OxyContin twice a day and Percocet no more than twice a day. (*Id.*)

On January 30, 2019, Couch went to St. Elizabeth Hospital, and was admitted for opioid detoxification and psychiatric treatment. (AR at 23). While at the hospital, Couch underwent a psychiatric evaluation with Dr. Michael Glavin. (*Id.*) Dr. Glavin diagnosed Couch with schizoaffective disorder and depressed opiate use disorder. (*Id.*) Couch remained in the hospital until February 2, 2019, when he was discharged with prescriptions for "Prozac, clonidine, bentyl, Ativan, and several medications for reflux symptoms." (*Id.*) Shortly after being discharged, Couch began seeing a therapist, Valerie Arwood, to treat his depression. (AR at 24).

On March 15, 2019, Couch had a follow-up appointment with Dr. Glavin, where he revealed that he started taking opiates again for back pain and complained of being lonely. (AR at 766). Later that month, Couch had a follow-up appointment with Dr. Goodman during which he

disclosed that his pain had decreased, but Dr. Goodman observed that he still displayed an antalgic (non-focal) gait. (AR at 21). Couch reported that his medicines were lasting longer and working better, but in April 2019 he reported increased pain. (*Id.*) Despite that increase, he said his functionality had improved. (*Id.*)

After submitting his disability insurance benefits application on June 13, 2019, Couch went to a follow-up appointment with nurse practitioner Randi Hahn on June 26. (*Id.*) He reported that he had been feeling stiff, walking with a limp, and experiencing an increased level of pain that was not improved by ice, heat, yoga, or medication. (*Id.*) Nurse Hahn noted that Couch displayed signs of opioid intoxication and withdrawal, gave Couch two fifteen-day prescriptions and administered a urine drug screen. (*Id.*) Later, in a July 2019 visit with Hahn, Couch reported that he was taking 15mg of Oxycodone for breakthrough pain, but Hahn noted that he displayed no signs of intoxication or withdrawal. (*Id.*)

Couch met with Dr. Fatimah Oloriegbe, M.D., on September 19, 2019 for a consultation and examination of his constant lower back pain. (*Id.*) Dr. Oloriegbe's exam revealed that Couch was able to walk more than fifty feet without assistance with an antalgic gait, but could not heel/toe walk. (*Id.*) Dr. Oloriegbe diagnosed Couch with lower back pain with radiculopathy, possibly due to building or herniated discs. (*Id.*)

Couch presented at Morris Hospital on October 16, 2019, with complaints of abdominal pain. (AR at 22). His CT scan revealed no acute abnormalities, but mild disc disease, facet arthropathy, and spinal canal stenosis. (*Id.*) The following day, Couch returned to Nurse Hahn and reported a pain level of nine out of ten. (*Id.*) Hahn conducted a physical exam which revealed a halting gait and tender facets and joints. (*Id.*) She prescribed Flexeril, a trial of a Lidocaine patch, and increased Couch's Oxycodone prescription. (*Id.*)

3

In February 2020, Couch continued to display moderate to severe pain. (*Id*.) Due to his physical limitation in bending his limbs, Dr. Goodman prescribed him another Oxycodone pill to take at nighttime. (*Id*.) At a follow-up appointment with nurse practitioner Marie Ann Korallus in April 2020, Couch reported experiencing 60% pain relief with medications. (*Id*.)

Couch was hospitalized again on May 23, 2020 at St. Elizabeth Hospital for psychiatric issues. (AR at 25). He stated that he was considering driving his car into a tree and said he would shoot himself in the head if he had a gun. (*Id*.) Dr. Glavin evaluated him and noted that Couch suffered from anxiety, depression, and suicidal thoughts. (*Id*.) Dr. Glavin diagnosed him with schizoaffective disorder, depression, and generalized anxiety disorder. (*Id*.) During his examination, Couch exhibited moderate distress, an obsessive thought process, and impaired judgment and insight. (*Id*.) Couch remained at St. Elizabeth Hospital for two days and was treated with antidepressants and therapy. (*Id*.)

II.     **Procedural Background**

On September 2, 2020, ALJ Kathleen Kadlec adjudicated Couch as not disabled and denied him disability insurance benefits (the "September 2020 Opinion"). (AR at 752–73). On November 25, 2020, the Appeals Council denied review of the September 2020 Opinion. (AR at 1). On appeal, the Honorable Michael M. Mihm of the Central District of Illinois remanded the matter to the Appeals Counsel (the "Remand Order"),[3] directing it to remand the case to the ALJ. (AR at 790). Judge Mihm ordered the ALJ to issue a new decision including further evaluation of the medical evidence, including medical opinion evidence; further evaluation of Couch's subjective

---

[3] It is unclear why Couch filed the instant action in the Northern District of Illinois instead of the Central District of Illinois. The civil cover sheet is unhelpful in determining whether Couch may have moved into the Northern District because it names the wrong Plaintiff and, therefore, an irrelevant address. Nonetheless, the government failed to raise any venue challenge, waiving the issue. *Weinberger v. Salfi*, 422 U.S. 749, 763–64 (1975); *Mathews v. Eldridge*, 424 U.S. 319, 328 n.9 (1976).

symptoms; and further evaluation of Couch's residual functional capacity ("RFC")—to include an explanation of how the medical evidence supports the ALJ's earlier RFC findings. (*Id.*) In accordance with the Remand Order, the Appeals Counsel returned the matter to the ALJ with specific instructions to (1) further evaluate Couch's alleged symptoms and provide rationale for such analysis in accordance with 20 C.F.R. § 416.929 and Social Security Ruling 16-3p; and (2) further consider Couch's maximum RFC, including limitations resulting from his mental impairments. (AR at 797–99).

### III. Hearing Testimony

The ALJ held a hearing on January 18, 2023. (AR at 672). Couch testified that he lives alone in a trailer on his mother's property with a couple of dogs and cares for himself, but his mother comes over often to help him when he is experiencing back pain. (AR at 284, 689, 804). To manage his back pain, Couch testified that he sees a pain specialist a few times a year. (*See generally* AR at 721–22). His treatments include medicine, such as Oxycodone, and physical therapy. (AR at 721, 724). Couch testified that he is addicted to Oxycodone, which he has been taking for twelve years. (AR at 724–25, 728). He said that the negative effects of withdrawal prevent him from quitting even though the opiates make his depression "worse," and he feels like a "prisoner" to the drug. (AR at 725, 728).

With respect to his physical capabilities, Couch testified that he could stand and walk for about 10–20 minutes at a time and lift about 10–20 pounds. (AR at 729). His mental health issues prohibit him from being in crowds, and oftentimes his mother does his grocery shopping for him. (AR at 729–32). Although he does not see people in person often, he speaks on the phone with his friends or family every day. (AR at 736). Couch spends most of the day watching television, but he has a difficult time concentrating on the television and on tasks generally. (AR at 735). He

5

further testified that he hears angry voices in his head at night and suffers from paranoia. (AR at 735–38).

A vocational expert testified at Couch's hearing regarding whether someone assessed with functional capacity capable of "light exertional limitation" could find work in the national economy. (AR at 737). The vocational expert averred that someone capable of light work with some limitations can work in the national economy as a basket filler, laundry classifier, or a marking clerk. (AR at 739). The vocational expert further testified that if a person's limitation included no more than four hours of standing and walking combined, that person could still find a job in the national economy, such as a mail clerk or a production helper. (AR at 739–40). If, however, the individual was off task twenty percent of the time, or absent one or two times per month—as Couch would be given his dependence on Oxycodone—the vocational expert testified that such an individual would not remain competitive for any of the positions identified. (AR at 743).

## IV.     The June 2023 Opinion

On June 23, 2023, the ALJ issued a new opinion (the "June 2023 Opinion"). (AR 669–698). Once again, the ALJ applied the five-step analysis required by 20 C.F.R. § 416.920(a). (AR at 673). She concluded that Couch had not engaged in substantial gainful employment since June 1, 2018 (step one). (AR at 675). She also found that Couch suffers from the severe impairments of biceps tendonitis, degenerative disc disease of the lumbar spine, anxiety, depression, and opioid dependence with withdrawal (step two). (*Id.*)

At step three, the ALJ determined that, even with the substance use, none of Couch's impairments or combination of impairments met or medically equaled the severity of one of the

6

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.)[4] Regarding Couch's mental impairments, the ALJ found: Couch has a mild limitation in understanding, remembering, or applying information; his mental status examinations demonstrated that his memory and cognition were generally intact; and he is successful at caring for himself, his pets, and his home. (AR at 676).

The ALJ also concluded that Couch has a moderate limitation in interacting with others. (*Id.*) Although Couch testified that he has difficulty being in crowds, the ALJ noted that he can shop in stores, spend time with his nephew, talk on the phone with his friends, and is generally "pleasant and/or cooperative." (AR at 676–77). The ALJ also found that Couch has only a moderate limitation in concentrating, persisting, or maintaining pace as he is able to care for himself, his pets, and his household. (AR at 677).

The ALJ next determined that Couch has a marked limitation in adapting or managing himself. (*Id.*) Couch experiences suicidal ideation daily because of his Oxycodone addiction and testified at the hearing that he is unable to quit. (*Id.*) Because Couch has a marked limitation in adapting or managing oneself, the ALJ found that he is unable to maintain the necessary on-task behavior and attendance that is required for competitive employment. (AR at 677–78). However, because the ALJ determined that Couch's mental impairment does not cause two marked limitations or one extreme limitation, the "paragraph B" criteria were not satisfied, and Couch was

---

[4] "Listings 12.02, 12.03, 12.04, 12.06, and 12.15 have three paragraphs, designated A, B, and C; your mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2). "Paragraph B of each listing (except 12.05) provides the functional criteria we assess . . . to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. . . . To satisfy the paragraph B criteria, your mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." § 12.00(A)(2)(b). A moderate limitation means that a claimant's ability to sustain functioning in that area is "fair," whereas a marked limitation means that a claimant's ability to sustain functioning in that area is "seriously limited." § 12.00(F)(2); *see also Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) ("'[F]air' in ordinary usage does not mean 'bad' or 'inadequate.'").

7

not found disabled at step three. (AR at 678). The ALJ then conducted the residual functional capacity assessment[5] used in steps four and five. She found that Couch could perform "light work"[6] as defined in 20 C.F.R. § 416.967(b) with some modifications. (*Id.*)

Next, the ALJ considered whether substance abuse was *material* to Couch's disability.[7] In other words, the ALJ assessed whether Couch would still be disabled if he stopped using drugs and alcohol. *See* 20 C.F.R. § 416.935; SSR 13-2p. If so, Couch would be entitled to benefits. After considering the opinions from Couch's treating physicians and clinical psychologists, the ALJ determined that the evidence in the record demonstrates that Couch's physical pain does not preclude him from light work. (AR at 687, 689). Accordingly, the ALJ concluded that Couch would not be disabled if he stopped his substance use. (AR at 689).

The ALJ next conducted the mental residual functional capacity assessment.[8] She concluded that, without substance use, Couch could perform light work with limitations. (AR at 697). Thus, she determined that because Couch would not be disabled if he stopped his substance

---

[5] "If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record, as explained in § 404.1545." 20 C.F.R. § 1520(e). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling, SSR 96-8p; Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474, 34475 (July 2, 1996).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967(b)

[7] Sections 223(d)(2)(C) and 1614(a)(3)(J) of the Social Security Act provide that a claimant "shall not be considered to be disabled . . . if alcoholism or drug addiction would be a contributing factor material to the Commissioner's determination that the individual is disabled."

[8] "If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record, as explained in § 404.1545." 20 C.F.R. § 1520(e). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling, SSR 96-8p; Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474, 34475 (July 2, 1996).

use, his substance use disorder is material to the determination of disability, and Couch is therefore not disabled within the meaning of the Social Security Act. (AR at 698).

## SOCIAL SECURITY REGULATIONS AND STANDARD OF REVIEW

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. §§ 404.1520, 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over, and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must consider (5) the claimant's age, education, and prior work experience and evaluate whether he is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities he is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show there are significant jobs available that the claimant is able to perform. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In cases involving Drug Addiction and Alcoholism ("DAA"), the ALJ must also analyze whether DAA is material to the determination of disability.

> The DAA materiality analysis as described in SSR 13-2p asks at step one whether the claimant has DAA. If yes, at step two the ALJ determines whether the claimant

9

> is disabled considering all the impairments, including DAA. If the answer is yes, the third step asks whether DAA is the only impairment. If the answer is yes, then DAA is material and the claim is denied. If no, [under the fourth step] the ALJ then asks whether the other impairments are "disabling by [themselves] while the claimant is dependent upon or abusing drugs or alcohol?" If the answer is no, then DAA is material and the claim is denied. If the answer is yes, then the ALJ proceeds to step five and asks whether DAA causes or affects the claimant's medically determinable impairments. If the answer is no, then DAA is not material and the claimant is found disabled. If the answer is "[y]es, but the other impairment(s) is irreversible or could not improve to the point of nondisability," then the claimant is found to be disabled. If the answer is "[y]es, and DAA could be material," the ALJ then proceeds to a sixth step to determine whether the other impairments would "improve to the point of nondisability in the absence of DAA?" If the answer is yes, DAA is material and the claim is denied. If the answer is no, then the claimant is found to be disabled.

*Hundley v. Colvin*, 2016 WL 423548, at *6 (D.S.C. Jan. 12, 2016) (citing SSR 13-2p). While the claimant bears the burden of proving that DAA is not a contributing factor material to his disability, the ALJ must still "adequately disentangle" the effects of a claimant's substance abuse from those of his other impairments. *Harlin v. Astrue*, 424 F. App'x 564, 567–68 (7th Cir. 2011).

In disability insurance benefits cases, a federal court's scope of review is limited to deciding whether the Commissioner's final decision is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). In other words, this Court will only reverse an ALJ's decision if the record "compels a contrary result." *Thorlton v. King*, 127 F.4th 1078, 1081 (7th Cir. 2025) (internal quotations and citation omitted). The Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001.

10

**DISCUSSION**

With respect to his Title XVI benefits, Plaintiff alleges the ALJ made two errors: (1) the ALJ failed to support her finding that, but for Plaintiff's opioid dependence, he would not be disabled; and (2) the ALJ violated the Remand Order by again failing to provide an adequate evaluation of Plaintiff's mental RFC. The Court addresses each of these issues in turn.

I.    **Substance Abuse Materiality**

Substantial evidence supports the ALJ's finding that, but for his opioid dependence, Couch would not be disabled. Couch suggests that the ALJ's June 2023 Opinion lacks an adequate discussion of Social Security Rule 13-02 and fails to "adequately disentangle" the effects of his substance abuse from his other impairments. (Dkt. 11 at 11)[9]; *Harlin v. Astrue*, 424 F. App'x 564, 567–68 (7th Cir. 2011). While the ALJ did not incorporate the strictures of the SSR 13-2 analysis, a review of her 26-page opinion makes clear that she addressed each of the six elements and considered the record as a whole in arriving at her decision.

The critical findings in this case relate to the ALJ's competing paragraph B criteria ratings and accompanying analysis. When the ALJ discussed the paragraph B criteria, factoring in Couch's substance abuse, she noted that he would be off task for 20% of the workday due to substance abuse and opioid dependence. (AR at 678). Considering the paragraph B criteria without Couch's admitted substance abuse, however, the ALJ found that Couch would no longer be off task for 20% of the workday and would be permitted to perform at least three jobs in the national economy, leading her to conclude that Couch's opioid addiction is material to his disability. (AR at 689).

---

[9] Instead of seeking leave to file a motion above the 15-page limit set forth in Local Rule 7.1, Plaintiff's counsel appears to have engaged in the unacceptable practice of shrinking the margins of his submission to comply with the limit. (*See* Dkt. 11). Consequently, his brief now violates L.R. 5.2, which provides that all margins must be a minimum of one inch. The Court cautions counsel against future attempts to circumvent the Court's Local Rules.

Couch argues that the ALJ's conclusions related to his off-task time with and without opioid use, and the differing results of her paragraph B criteria analyses relating to Couch's ability to adapt and manage himself, are unsupported by the record. (Dkt. 11 at 11–12). Couch's arguments, however, amount to a disagreement with how the ALJ weighed the evidence. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) ("In our substantial evidence determination, we review the entire administrative record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."). The entire administrative record in this case demonstrates that Couch's own testimony and medical notes from his care providers support the conclusion that Couch's opioid addiction had significant impacts on his ability to interact with the world and manage himself. For example, the ALJ cited to Couch's hearing testimony where he stated that the frequency and intensity of his suicidal ideations were largely attributed to his use of and addiction to Oxycodone. (AR at 689, 726–28). The ALJ also included a discussion of medical evidence that suggests Couch's mental impairments improve when he takes his medications as prescribed and worsen when he abuses opioids. (AR at 691).

Finally, Couch argues that the ALJ failed to support her conclusion that cessation of opioid abuse would improve his functioning. (Dkt. 11 at 13). "Often, evidence from a period of abstinence is the best evidence for determining the relationship between [substance] use and other impairments." *Komperda v. Colvin*, 2015 WL 639192, at *6 (N.D. Ill. Feb. 13, 2015). It is inherently difficult, however, for an ALJ to pinpoint periods of sobriety with as long a history of abuse as this case presents—the Commissioner, Couch, and indeed the Social Security regulations all recognize this reality. Still, the record demonstrates that the ALJ did a sufficient job disentangling Couch's complicated history and identified periods of abuse and abstinence by

identifying normal examination findings when Couch was not abusing opioids as compared to signs of distress and deterioration when he was. (*See, e.g.*, AR at 682). There is thus a logical bridge between the evidence and the ALJ's conclusion with respect to cessation of use.

While Couch points to evidence in the record that indicates his impairments are what they are irrespective of his opioid addiction, those facts do not compel the conclusion that DAA is immaterial to his disability. The ALJ's thorough opinion clears the low evidentiary sufficiency threshold that applies under the substantial evidence standard. *Biestek*, 587 U.S. at 103. There is nothing in either Couch's motion or the record to support the conclusion that the ALJ ignored critical evidence or presented a skewed version of the facts. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). Instead, this is merely a case with inconclusive and, at times, contradictory evidence; the ALJ sufficiently untangled that evidence in reaching her conclusion. *See Underwood v. Astrue*, 430 F. App'x 532, 536 (7th Cir. 2011). Reversal of the ALJ's DAA materiality finding is not warranted.

**II.     Mental RFC Assessment**

When an ALJ evaluates a claimants RFC, their task is to calculate which work-related activities a claimant can perform given his limitations. *Young*, 362 F.3d at 1000; 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.") The RFC must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1).

Here, Couch claims that the ALJ's analysis is insufficient because she was required to obtain additional medical expert opinions, and she did not do so. (Dkt. 11 at 14). But, as the Commissioner points out, the ALJ added multiple opinions to the record postdating the ALJ's April 2020 decision. (*See* AR at 806 (David Voss, Ph.D. in June 2021), 809 (John Peterson, M.D.

13

in August 2021), 820 (Frank Mikell, M.D. in February 2022), 822 (Howard Tin, Psy.D. in February 2022)). Accordingly, the ALJ satisfied her directive to obtain additional medical expert opinions.

Couch also complains that the ALJ inappropriately offset examination findings with observations that he had friends, shopped, or showed benign examination findings. But it is the ALJ's duty to resolve evidentiary conflicts and this Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Young*, 362 F.3d at 1001. Couch cannot succeed merely because he disagrees with the ALJ, he must explain how the ALJ's opinion is not "based upon substantial evidence [or] the proper legal criteria." *Barnhart*, 357 F.3d at 699 (7th Cir. 2004).

Finally, Couch claims that the ALJ "offered little to no narrative to explain how the paragraph B assessments translated into an ability to perform unskilled work on a full-time basis, without any work-preclusive deficits in on-task behavior." (Dkt. 11 at 15). But courts in this district have consistently rejected this argument. *See, e.g.*, *Jessica K. v. Saul*, 2020 WL 4015330, at *7 (N.D. Ill. Jul. 16, 2020) ("While there may be other evidence that could support/disprove any of the ALJ's conclusions in her Paragraph B analysis, this is merely a question of weighing the evidence"); *Brookins v. Saul*, 2020 WL 4365909, at *5 (N.D. Ill. Jul. 30, 2020) (challenge to paragraph B criteria rejected because "it is not the Court's role to second guess the ALJ's reasonable interpretations of the record"); *Esther V. v. Saul*, 2021 WL 1121123, at *5 (N.D. Ill. Mar. 24, 2021) (a paragraph B analysis "is a question of weighing the evidence" and the ALJ's analysis will be upheld even if reasonable minds could differ); *Robert S. v. Kijakazi,* 2022 WL 45036, at *6 (N.D. Ill. Jan. 5, 2022) ("[T]he ALJ's findings simply followed the finding of the state agency psychologist . . . . The opinion of a reviewing psychologist constitutes substantial evidence on the question of whether a plaintiff's impairments meet or equal a listing."). Couch

does not point to any limitations unfairly omitted from the RFC. Further, Couch does not argue that the ALJ improperly relied on Dr. Voss and Dr. Tim's opinions that he should be restricted to simple tasks with limited contact with coworkers and the public. Accordingly, Couch's arguments are insufficient to overturn the ALJ's finding regarding his mental RFC.

## CONCLUSION

For the reasons set forth above, the Commissioner's Motion for Summary Judgment [14] is granted. Couch's Motion for Reversal or Remand [11] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: March 30, 2025